Colorado Court of Appeals Opinions || August 13, 2015


Colorado Court of Appeals -- August 13, 2015
2015 COA 108. No. 12CA1546. People v. Ellis.



 Â 

 
 
 
 COLORADO COURT OF APPEALS

 
 2015 COA 108

 
 



 Court of Appeals No. 12CA1546
 El Paso County District Court No. 10CR3758
 Honorable Barney Iuppa, Judge
 Honorable Peter Warren Booth, Judge


 The People of the State of Colorado,

 Plaintiff-Appellee,

 v.

 Jordan Lee Ellis,

 Defendant-Appellant.


 JUDGEMENT AFFIRMED, SENTENCE VACATED,
 AND CASE REMANDED WITH DIRECTIONS

 Division I
 Opinion by JUDGE TAUBMAN
 Gabriel, J., concurs
 Booras, J., concurs in part and dissents in part

 Announced August 13, 2015


 John W. Suthers, Attorney General, Joseph G. Michaels, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

 Mallika L. Magner, Boulder, Colorado, for Defendant-Appellant
 Â 

 Â¶1Â Â Â Â Â Â Â  Defendant, Jordan Lee Ellis, appeals his judgment of conviction and sentence entered on a jury verdict finding him guilty of first degree murder â extreme indifference, second degree murder with the use of a deadly weapon, criminal attempt to commit first degree murder, extreme indifference with the use of a deadly weapon, and illegal discharge of a weapon. We affirm the judgment, vacate the sentence, and remand for a determination of Ellisâs life expectancy and whether his sentence leaves him a meaningful opportunity for release and for correction of the mittimus.

 I. Background

 Â¶2Â Â Â Â Â Â Â  Ellis was seventeen years old when he shot and killed C.H. and wounded N.A. from the backseat of his friendâs car. Frank Miller and A.J. Nelson, two military veterans who had recently returned from the conflicts in Afghanistan and Iraq, accompanied Ellis on the night of the shooting. Miller hosted a party that night, which Nelson and Ellis attended. At one point, Miller received a phone call. Whatever was said on the call made Miller very angry. He walked into his room, grabbed his gun, and Nelson and Ellis followed him from the party and into his car.Â As the three approached a nearby shopping center, Miller handed Ellis his gun and told him that he had to shoot someone that night in order to be initiated into Millerâs gang. Miller then ordered Ellis to shoot the first person he saw. As the two victims came into view, Ellis stuck the gun out of the truckâs window and pulled the trigger, killing C.H. and wounding N.A.

 Â¶3Â Â Â Â Â Â Â  At trial, the defense presented substantial evidence of Ellisâs adverse upbringing to argue that Ellis could not form the requisite intent to commit first degree murder. That evidence included testimony that his mother had abandoned him when he was two years old, leaving him with his biological father who disputed paternity; his father, who was a bipolar alcoholic and drug user, physically abused him for years until the father was imprisoned; he had various learning disabilities; his mother returned to his life only to die suddenly thereafter; and he had been hospitalized recently for suicidal ideations and distress.

 Â¶4Â Â Â Â Â Â Â  The defenseâs theory, supported by psychological expert testimony, was that Ellisâs troubled upbringing hampered his mental development, causing him to suffer extreme highs and lowsÂ in emotional expression, rage, anger, and emotional deregulation. The expert also opined that Ellis suffered from reactive attachment disorder, which caused him to fear authority and persistently seek acceptance from those around him. The defense asserted that Ellis viewed Miller and Nelson as the family he desperately needed, making him unduly susceptible to their demands.

 Â¶5Â Â Â Â Â Â Â  The expert concluded that, at the time of the shooting, Ellis was in a state of terror and fear, which caused him to reflexively shoot C.H. and N.A.

 Â¶6Â Â Â Â Â Â Â  The jury acquitted Ellis of first degree murder after deliberation, but convicted him of first degree murder â extreme indifference of C.H.; second degree murder with the use of a deadly weapon of C.H.; criminal attempt to commit first degree murder of N.A.; extreme indifference with the use of a deadly weapon; and illegal discharge of a weapon. Acknowledging âthe cruelty [Ellis] suffered as a child,â the trial court sentenced Ellis to life with the possibility of parole after forty years on the first degree murder conviction and a thirty-two-year consecutive sentence for the attempted first degree murder â extreme indifference conviction.

 II. Constitutionality of Ellisâs Sentence

 Â¶7Â Â Â Â Â Â Â  Ellis contends that his sentence to life with the possibility of parole after a minimum of forty years imprisonment, together with his mandatory consecutive term of thirty-two years imprisonment is the equivalent of life without the possibility of parole. He argues that his sentence is unconstitutional because it was imposed without consideration of the factors set forth in Miller v. Alabama, 567 U.S. ___, 132 S. Ct. 2455 (2012). We conclude that the trial court did not consider Ellisâs âyouth and attendant characteristics,â as is now required by Miller and People v. Tate, 2015 CO 42, Â¶6, __ P.3d __, __. 1 Following other divisions of this court in People v. Rainer, 2013 COA 51, Â¶21, __ P.3d __, __ (cert. granted Dec. 22, 2014); People v. Lucero, 2013 COA 53, Â¶2, __ P.3d __, __ (cert. granted Dec. 22, 2014); and People v. Lehmkuhl, 2013 COA 98, Â¶13, __ P.3d __, __ (cert. granted Dec. 22, 2014), we furtherÂ conclude that his sentence would constitute a de facto life sentence without the possibility of parole if it leaves him without a meaningful opportunity for release. However, because Ellisâs contention depends on a factual determination of his life expectancy, which the trial court did not previously conduct, we remand to the trial court to determine Ellisâs life expectancy and for further related proceedings.

 A. Standard of Review and Applicable Law

 Â¶8Â Â Â Â Â Â Â  We review de novo the constitutionality of a trial courtâs sentencing determination. People v. Wilder, 2015 COA 14, Â¶10, __ P.3d __, __.

 Â¶9Â Â Â Â Â Â Â  The Eighth Amendment prohibits âcruel and unusual punishments,â U.S. Const. amend. VIII, and âguarantees individuals the right not to be subjected to excessive sanctions,â Roper v. Simmons, 543 U.S. 551, 560 (2005). The Supreme Court has explained that â[t]hat right . . . flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense.â Miller, 567 U.S. at __, 132 S. Ct. at 2463 (internal quotation marks omitted).Â 

 Â¶10Â Â Â Â Â Â Â  In recent years, the Supreme Court has decided several cases under the precept that âchildren are constitutionally different from adults for purposes of sentencing.â Id. at __, 132 S. Ct. at 2464.

 Â¶11Â Â Â Â Â Â Â  First, in Roper v. Simmons, the Court held that the Eighth and Fourteenth Amendments prohibit the imposition of the death penalty for juvenile offenders. 543 U.S. at 578.

 Â¶12Â Â Â Â Â Â Â  Next, in Graham v. Florida, 560 U.S. 48, 75 (2010), the Supreme Court held that the Eighth Amendment categorically prohibits sentencing juveniles convicted of nonhomicide crimes to life imprisonment without the possibility of parole

 Â¶13Â Â Â Â Â Â Â  Next, in Miller v. Alabama, the Supreme Court extended its ruling in Graham, holding that the Eighth Amendment prohibits mandatory life sentences without the possibility of parole for juveniles convicted of homicide. 567 U.S. at __, 132 S. Ct. at 2469. Although Miller does not categorically prohibit the imposition of life without the possibility of parole for juvenile offenders, it requires courts to consider certain factors before sentencing juveniles to life without parole. Id. As the Colorado Supreme Court has explained, Miller requires that sentencing courts consider a defendantâs âyouthÂ and attendant characteristics.â Tate, Â¶6, __ P.3d at __ (internal quotation marks omitted). Specifically, sentencing courts must consider âhow children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.â Miller, 567 U.S. at __, 132 S. Ct. at 2469. However, the Court warned that given âchildrenâs diminished culpability and heightened capacity for change . . . appropriate occasions for sentencing juveniles to [life without parole] will be uncommon.â Id.

 Â¶14Â Â Â Â Â Â Â  In Rainer, Â¶21, __ P.3d at __, a division of this court applied Graham and concluded that consecutive sentences for nonhomicide crimes, including two counts of attempted first degree murder, could amount to the de facto equivalent of an unconstitutional life without parole sentence. The defendant in Rainer had received an aggregate sentence of 224 years imprisonment for two counts of attempted first degree murder, two counts of first degree assault, one count of first degree burglary, and one count of aggravated robbery, committed while he was seventeen years old. Id. Because he would first be eligible for parole after his life expectancy, as determined by the trial court, the division held that his aggregateÂ sentence was the functional equivalent of a life without parole sentence, and therefore unconstitutional under Graham. Id. at Â¶Â¶38, 66, __ P.3d at __.

 Â¶15Â Â Â Â Â Â Â  In two subsequent published cases, divisions of this court have applied the holding in Graham to circumstances where a juvenileâs consecutive sentences for nonhomicide offenses arguably amounted to a de facto life sentence. Those divisions followed Rainer, but concluded that, considering the defendantsâ life expectancy and the sentences imposed, the defendants had a reasonable possibility of parole during their life expectancy. Lehmkuhl, Â¶13, __ P.3d at __ (consecutive sentences for nonhomicide offenses not unconstitutional because defendant would be eligible for parole when he was sixty-seven and his life expectancy was seventy-eight years); Lucero, Â¶2, __ P.3d at __ (consecutive sentences totaling eighty-four years for nonhomicide offenses not unconstitutional because defendant would be eligible for parole when he was fifty-seven and his life expectancy was seventy-five years).Â 

 Â¶16Â Â Â Â Â Â Â  In Tate, the Colorado Supreme Court considered the appropriate remedy for juveniles sentenced to mandatory life without the possibility of parole under the statutory sentencing guidelines for class one felonies in effect between 1990 and 2006, which Miller rendered unconstitutional. Â¶33, __ P.3d at __. It concluded that if, after considering the defendantâs âyouth and attendant characteristics,â the trial court concludes that life without the possibility of parole is unwarranted, it should sentence such defendants to life with the possibility of parole after forty years. Id. at Â¶51, __ P.3d at __ (internal quotation marks omitted).

 Â¶17Â Â Â Â Â Â Â  This case presents a question not addressed in either the Graham-Rainer or Miller-Tate line of cases because it combines a sentence for first degree murder with the possibility of parole with a mandatory consecutive sentence for a nonhomicide offense. Ellis contends that his consecutive sentences constitute a de facto life sentence without the possibility of parole as recognized in Rainer, Lucero, and Lehmkuhl. He further contends that his sentence is unconstitutional because it was imposed without consideration of the factors set forth in Miller.

 B. Analysis

 Â¶18Â Â Â Â Â Â Â  The trial court sentenced Ellis prior to the announcement of Miller v. Alabama. At sentencing, defense counsel, relying on Roper and Graham, argued that Ellisâs youth and immaturity entitled him to a more lenient sentence and asked that the court sentence Ellis to a concurrent sentence for his conviction for attempted first degree murder.

 Â¶19Â Â Â Â Â Â Â  The trial court sentenced Ellis to life with the possibility of parole after forty years for first degree murder â extreme indifference of C.H., and added an additional consecutive sentence, which it believed was mandatory. Next, the court sentenced Ellis to a consecutive term of thirty-two years for attempted murder â extreme indifference of N.A. In imposing the sentence, the court stated, âthe statute governing crimes of violence [Â§ 18-1.3-406(2)(a)(I)(A), C.R.S. 2014] mandates that I make the second sentence just announced consecutive to the first.â Finally, the court imposed a concurrent sentence of three years for illegal discharge of a weapon.

 Â¶20Â Â Â Â Â Â Â  We conclude that the constitutionality of Ellisâs sentence depends on whether it allows him a meaningful opportunity for release during his lifetime.[2] Because this depends on a factual determination of his life expectancy, we remand the case to the trial court. See Wilder, Â¶50, __ P.3d at __ (remanding the question of whether defendantâs sentences constituted de facto life without parole because the record lacked the necessary factual findings).

 Â¶21Â Â Â Â Â Â Â  First, the court should determine both Ellisâs life expectancy and his first parole eligibility date. The parties disagree on both Ellisâs life expectancy and his first parole eligibility date and, absent factual findings on these two issues, we cannot decide whether his sentence is constitutional. For example, on appeal, the parties have cited conflicting evidence of both Ellisâs life expectancy and the date at which he will first be parole eligible. Ellis references a Centers for Disease Control and Prevention survey that places life expectancy for black males born in 1990 and later at sixty-four andÂ one half years. He further argues that most statistical tables do not reflect the shorter life expectancy of prison inmates. Conversely, the People reference statutory life expectancy tables which, prior to their repeal in 2014, placed Ellisâs life expectancy at seventy-six years. Ch. 71, sec. 1, Â§ 13-25-103, 1993 Colo. Sess. Laws 250-52, repealed by Ch. 46, sec. 2, Â§ 13-25-103, 2014 Colo. Sess. Laws 222. Now, section 13-25-102, C.R.S. 2014, directs courts to receive into evidence United States census information to determine life expectancy.

 Â¶22Â Â Â Â Â Â Â  That statute provides, in relevant part:

 In all civil actions, special proceedings, or other modes of litigation in courts of justice . . . , when it is necessary to establish the expectancy of continued life of any person from any period of such personâs life . . ., the most recent United States census bureau expectation of life and expected deaths by race, sex, and age table, as published by the United States census bureau from time to time, must be received as evidence, together with other evidence as to health, constitution, habits, and occupation of the person regarding the personâs expectancy of continued life.

 Â¶23Â Â Â Â Â Â Â  Because neither the parties nor the trial court have had the opportunity to consider the applicability and, if applicable, theÂ provisions of this statute, as amended in 2014, the court on remand shall consider the applicability of this statute, and, if applicable, issues including the Peopleâs argument that consideration of a defendantâs race or gender when considering life expectancy could result in a violation of the Equal Protection Clause of the Fourteenth Amendment.

 Â¶24Â Â Â Â Â Â Â  The People also argue that the trial court should consider Ellisâs ability to gain good behavior and earned time credit and his potential for early release when determining whether his sentence allows him a meaningful opportunity for release.

 Â¶25Â Â Â Â Â Â Â  We reject this contention. Both good time and earned time credits are discretionary. Thus, even if an inmate accumulates such credits, the Department of Corrections is not required to award them so as to recalculate an inmateâs release date. See Â§ 17Â­22.5-301(3), C.R.S. 2014 (good time); Â§ 17-22.5-302(1.5)(a), C.R.S. 2014 (earned time).

 Â¶26Â Â Â Â Â Â Â  Second, the trial court must determine whether Ellisâs sentence leaves him a meaningful opportunity for release during his lifetime. If it does not, it is unconstitutional and the court mustÂ conduct a resentencing hearing where it considers the factors set forth in Miller. 567 U.S. at __, 132 S. Ct. at 2469; see also Tate, Â¶4, __ P.3d at __. We recognize that the trial court may conclude that life without the possibility of parole is an appropriate sentence for Ellis. However, we note that the Supreme Court has observed that âappropriate occasions for sentencing juveniles [to life without the possibility of parole] will be uncommon.â Miller, 567 U.S. at __, 132 S. Ct. at 2469; see also Tate, Â¶38, __ P.3d at __ (âThe imposition of [a life without the possibility of parole] sentence, again as Miller contemplates, should be âuncommonâ and ârare.ââ)

 Â¶27Â Â Â Â Â Â Â  Alternatively, should the trial court conclude that a de facto sentence to life without the possibility of parole is unwarranted, it should resentence Ellis consistent with the principles announced in Tate, and impose a sentence that allows for the possibility of parole after no earlier than forty years of imprisonment.

 Â¶28Â Â Â Â Â Â Â  We recognize that Ellis was sentenced under a different statutory scheme than the defendant in Tate. However, Tate precluded a resentencing court from imposing a sentence that allows for the possibility of parole earlier than forty years imprisonment. It therefore follows that, on remand, the most lenient sentence the trial court may impose on Ellis is life with the possibility of parole after forty years.

 Â¶29Â Â Â Â Â Â Â  Finally, the People assert that the trial court conducted an individualized sentencing hearing that comported with Miller. They point out that the court considered several factors in imposing Ellisâs sentence: statements made by the victimsâs relatives, statements made by Ellisâs family, the presentence report, ârecollections of a rather lengthy trial,â Millerâs sentence, and Ellisâs lack of a lengthy juvenile record of violent conduct. They further point out that the court exercised its discretion in sentencing Ellis to only thirty-two years for the attempt charge, and not the forty-eight-year maximum possible sentence. They argue that we may infer from this leniency that the court considered characteristics unique to Ellis in imposing its sentence.

 Â¶30Â Â Â Â Â Â Â  However, because the trial court sentenced Ellis prior to the announcement of Miller, it did not have the benefit of that decisionâs guidance. Although the trial court considered some factors unique to Ellis during sentencing, including âthe cruelty he suffered as aÂ child,â it did not reference Ellisâs âheightened capacity for changeâ or any objective considerations of âhow children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison,â as required by Miller. 567 U.S. at __, 132 S. Ct. at 2469. Further, the court specifically rejected the assertion that Ellisâs adverse upbringing warranted significant leniency in imposing his sentence.

 Â¶31Â Â Â Â Â Â Â  The trial court also explicitly stated its understanding that the sentencing statutes did not give it discretion to run Ellisâs sentences concurrently, and required that it sentence Ellis to life with the possibility of parole after forty years and a consecutive sentence for attempted murder.

 Â¶32Â Â Â Â Â Â Â  We conclude that the mandatory nature of Ellisâs consecutive sentences amounting to a de facto life sentence was inconsistent with Millerâs directive that trial courts conduct individualized sentencing procedures, consider defendantâs âyouth and attendant characteristics,â and exercise discretion before sentencing juveniles to life without the possibility of parole. Id. at __, 132 S. Ct. at 2471; Tate, Â¶4, __ P.3d at __.

 Â¶33Â Â Â Â Â Â Â  We also conclude that in imposing its sentence in light of Miller and Tate, the trial court may consider as one of many sentencing factors that Ellis was convicted of offenses involving two victims. See generally People v. Caballero, 282 P.3d 291, 295 (Cal. 2012); Brown v. State, 10 N.E.3d 1, 8 (Ind. 2014); State v. Null, 836 N.W.2d 41, 73 (Iowa 2013).

 Â¶34Â Â Â Â Â Â Â  Therefore, we remand to the trial court for a determination of Ellisâs life expectancy and first parole eligibility date and whether his sentence leaves him a meaningful opportunity for release, in accordance with Rainer, Lehmkuhl, and Lucero. If it does not, then it is unconstitutional and the court must conduct an individualized resentencing hearing where it considers, among other factors, Ellisâs âyouth and attendant characteristics.â After such a hearing, the most lenient sentence the court may impose is life with the possibility of parole after forty years.

 III. Direct File Statute

 Â¶35Â Â Â Â Â Â Â  Next, Ellis contends that the trial court erred when it denied his request for a direct transfer hearing. Specifically, he asserts that the trial court should have applied section 19-2-517(3)(a),Â C.R.S. 2014, retroactively, and permitted him to file a motion for a reverse transfer to juvenile court. We disagree.

 A. Standard of Review

 Â¶36Â Â Â Â Â Â Â  Ellis raises an issue of statutory interpretation which we review de novo. People in the Interest of K.W., 2012 COA 151, Â¶8, 317 P.3d 1237, 1239. When interpreting statutes, we must give effect to the legislatureâs purpose and intent and must examine the plain and ordinary meaning of the statutory language. Id.

 B. Applicable Law

 Â¶37Â Â Â Â Â Â Â  Section 19-2-517(1)(a)(I) permits prosecutors to charge juveniles sixteen years old or older as adults, without a transfer hearing, if their charges include a class one or two felony. During the 2012 legislative session, the General Assembly repealed and reenacted the entire direct file statute. Ch. 128, sec. 1, Â§ 19-2-517, 2012 Colo. Sess. Laws 439. The reenacted statute included a provision allowing juveniles charged by direct filing to file a motion with the district court seeking transfer to juvenile court. Â§ 19-2Â­517(3)(a). In such cases, the statute requires the court to hold a reverse-transfer hearing âwith the preliminary hearing.â Id. TheÂ statute then provides several factors which the trial court must consider, including the severity of the charged conduct, the juvenileâs age and maturity, and the juvenileâs potential for rehabilitation. Â§ 19-2-517(3)(b)(I)-(XI).

 C. Analysis

 Â¶38Â Â Â Â Â Â Â  The jury convicted Ellis on April 17, 2012. The reenacted section 19-2-517, which included the right to a reverse transfer hearing, became effective on April 20, 2012. Ch. 128, sec. 1, Â§ 19Â­2-517, 2012 Sess. Laws 445. On the day of his sentencing hearing, Ellis filed a motion, pursuant to section 19-2-517(3)(a), for a reverse transfer to juvenile court. In it, he argued that a statute may apply retroactively when it concerns a procedural rather than a substantive right. See Specialty Rests. Corp. v. Nelson, 231 P.3d 393, 399-400 (Colo. 2010). He alleged that section 19-2-517(3)(a) was a procedural change to the direct file statute, and therefore should be applied retroactively to his case. The trial court denied the motion as untimely.

 Â¶39Â Â Â Â Â Â Â  At the outset, we note that the General Assembly could have made the statute explicitly retroactive if that was its intent. SeeÂ City of Colo. Springs v. Powell, 156 P.3d 461, 464 (Colo. 2007) (âAbsent legislative intent to the contrary, we presume a statute operates prospectively. . . . [U]nless intent to the contrary is shown, legislation shall apply only to those transactions occurring after it takes effect.â).

 Â¶40Â Â Â Â Â Â Â  However, assuming without deciding that section 19-2Â­517(3)(a) applies retroactively, we nevertheless conclude that the trial court did not err when it denied Ellisâs reverse transfer motion as untimely. Section 19-2-517(3)(a) requires that juveniles wishing to file a reverse transfer motion âfile the motion no later than the time to request a preliminary hearing.â See Crim. P. 5 (felony defendants must request preliminary hearing within seven days following the filing of a felony complaint and the hearing must be held within thirty-five days of being scheduled).

 Â¶41Â Â Â Â Â Â Â  Therefore, applying the statute according to its terms, we conclude that, because Ellis filed his reverse transfer motion after he was convicted, it was untimely and the trial court did not err when it denied his reverse transfer motion. Even if we were to conclude that the reverse transfer statute applied, Ellis still wouldÂ have been subject to the mandatory minimum sentencing provisions of section 18-1.3-406 and he would not have been eligible for sentencing to the youthful offender system because he was convicted of a class one felony. See Â§ 19-2-517(6)(a)(I), (II). Thus, any error in not applying the reverse transfer statute was harmless.

 Â¶42Â Â Â Â Â Â Â  Therefore, we conclude that the trial court did not err when it denied Ellisâs reverse transfer motion as untimely.

 IV. Batson Challenges

 Â¶43Â Â Â Â Â Â Â  Next, Ellis contends that the trial court abused its discretion when it denied his Batson challenge to the prosecutionâs use of peremptory challenges to excuse two potential jurors, one black and one Hispanic, on account of their race. See Batson v. Kentucky, 476 U.S. 79, 86-87 (1985) (prohibiting discriminatory jury selection). Specifically, he challenges the trial courtâs ruling on the third Batson step, asserting that the prosecutionâs stated reason for removing the jurors was not credible. We disagree.

 A. Standard of Review and Applicable LawÂ 

 Â¶44Â Â Â Â Â Â Â  The Equal Protection Clause of the Fourteenth Amendment prohibits discriminatory jury selection. Id.; Craig v. Carlson, 161 P.3d 648, 653 (Colo. 2007). Therefore, the prosecution may not use peremptory challenges to purposefully discriminate against potential jurors on the basis of race. People v. Beauvais, 2014 COA 143, Â¶5, __ P.3d __, __.

 Â¶45Â Â Â Â Â Â Â  Batson requires trial courts to conduct a three-step analysis to determine whether the opponent of a peremptory challenge has proven the existence of purposeful discrimination in jury selection under the Equal Protection Clause. People v. Wilson, 2015 CO 54M, Â¶10, 351 P.3d 1126, 1131; Craig, 161 P.3d at 654. The first step requires the trial court to find that the opponent of the peremptory challenge presented evidence sufficient to establish a prima facie case of discrimination. Craig, 161 P.3d at 654. A prima facie case is established when the opponent raises an inference that discrimination occurred. Id. Once this inference is raised, the second step requires the court to evaluate the peremptory challengerâs proffered reasons for removing the jurors. Id. The proponentâs explanation need not be persuasive or plausible, soÂ long as it is facially neutral. Unless discriminatory intent is inherent in the proponentâs explanation, the offered reason will be deemed race-neutral. Id.

 Â¶46Â Â Â Â Â Â Â  âThe trial court is in a far better position than a reviewing court to make . . . credibility determinations.â Beauvais, Â¶7, __ P.3d at __. Therefore, in reviewing a trial courtâs Batson ruling, we defer to its factual findings as to whether the defendant proved intentional discrimination, and review its ruling on the trird step for clear error. See People v. Rodriguez, 2015 CO 55, Â¶13, 351 P.3d 423, 429.

 Â¶47Â Â Â Â Â Â Â  Ellis contests the trial courtâs Batson ruling on the third step only. That step requires the trial court to review all of the evidence and decide âwhether the opponent of the strike has shown, by a preponderance of evidence, that the proponent of the strike sought to exclude a potential juror because of a discriminatory reason.â People v. Collins, 187 P.3d 1178, 1182 (Colo. App. 2008). The decisive question at this step is ââwhether counselâs race-neutral explanation for a peremptory challenge should be believed.ââ People v. OâShaughnessy, 275 P.3d 687, 690 (Colo. App. 2010) (quotingÂ Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality opinion), affâd on other grounds, 2012 CO 9, 269 P.3d 1233). âTo answer this question, the court must evaluate the proponentâs credibility as to the proffered neutral explanation and determine whether it is more probably true than not that the proponent of the challenge excluded a potential juror for a discriminatory reason.â Craig, 161 P.3d at 654 (internal quotation marks and citation omitted). In making this determination, courts consider several factors, including the proponentâs demeanor, how reasonable or improbable the proponentâs explanations are, and whether the proffered rationale has some basis in accepted trial strategy. Id.; OâShaughnessy, 275 P.3d at 690.

 B. Analysis

 Â¶48Â Â Â Â Â Â Â  Ellis challenges the trial courtâs Batson ruling as to two jurors, Juror M and Juror G, on the third step only.

 1. Juror M

 Â¶49Â Â Â Â Â Â Â  As to Juror M, the prosecution stated that âfrom the first time I spoke with her . . . she appeared to be a defense [juror].â The prosecutor continued:

 She said things to the effect of â when asked why a person may not stand up to an abuser, [Juror M] said that there was fear â specifically, the fear of consequences . . . . She also said that an authority figure might have an effect on a person who is either being abused or controlled . . . . When asked about size . . . she said personally size did not matter to her . . . . Itâs more of a mental thing . . . . She said responsibility and accountability donât necessarily come naturally to a person . . . there is not always . . . an inborn sense of right and wrong.

 Â¶50Â Â Â Â Â Â Â  Ellis asserts that the prosecutionâs stated reasons were not race-neutral because (1) Juror Mâs statements were not relevant to his anticipated defense; (2) other jurors made similar comments regarding responsibility and accountability; (3) the trial courtâs findings were not specific enough; and (4) the prosecutionâs reasons were not supported by the record. The trial court concluded that the prosecutionâs stated reasons were believable. Because the courtâs ruling is supported by the record, we conclude that it did not clearly err when it denied Ellisâs Batson challenge as to Juror M.

 Â¶51Â Â Â Â Â Â Â  Juror Mâs statements regarding responsibility and accountability were relevant to Ellisâs culpability, a central issue inÂ the case. Ellisâs theory of defense was that his adverse upbringing, specifically the lack of a father figure, hampered his mental development, causing him to suffer extreme highs and lows in emotional expression. Expert witnesses for the defense testified that the lack of a father figure caused Ellis to suffer from reactive attachment disorder, which caused him to want to be loved and accepted. This caused Ellis to be unduly susceptible to the demands of Miller and Nelson, his accomplices.

 Â¶52Â Â Â Â Â Â Â  During voir dire, Juror M stated that a person âshould take responsibility and ownership. . . [but that] it all depends on what you are taught.â When asked whether she believed there are some things that a person knows are inherently right and wrong, she responded:

 Thatâs kind of hard for me to answer, because if you â I mean, if you have someone that â thatâs raising you that you trust to teach you guidance, and they are teaching you guidance in a totally different direction than what you should be going in, then itâs almost like â I donât know. I mean, itâs questionable. I do believe that, you know, based on some â to me, itâs just how you are raised and what you are taught to believe what is right and what is wrong.Â 

 Juror Mâs response suggested that she could excuse a person for not standing up to an authority figure. Such a belief played right into the defenseâs theory that Ellisâs troubled upbringing made him overtly susceptible to peer pressure, preventing him from forming the requisite intent for murder.

 Â¶53Â Â Â Â Â Â Â  We recognize that other potential jurors made similar comments about accountability, responsibility, and the importance of a father figure in a personâs upbringing. However, Ellis did not point this out to the trial court, and any error would not have been obvious. Finally, we reject Ellisâs assertions that the trial courtâs findings were not specific enough and that the prosecutionâs reasons were not supported by the record. In ruling, the court relied on specific, factually accurate statements by the prosecutor.

 Â¶54Â Â Â Â Â Â Â  Therefore, we conclude that the trial court did not abuse its discretion when it denied Ellisâs Batson challenge as to Juror M.

 2. Juror G

 Â¶55Â Â Â Â Â Â Â  As to Juror G, the prosecution sought to remove her because (1) she was sleeping during voir dire; (2) âshe seemed quite annoyed and put off at the prospect of having to be on a juryâ; and (3) herÂ body language was âless than . . . friendly.â The trial court credited these reasons and denied Ellisâs Batson challenge. Because the trial courtâs findings are supported by the record, we again conclude that it did not abuse its discretion when it denied Ellisâs Batson challenge as to Juror G.

 Â¶56Â Â Â Â Â Â Â  Although the trial court noted that it did not observe Juror Gâs body language or Juror G sleeping during voir dire, it found that the prosecutor had offered a race-neutral explanation. This is sufficient for us to uphold the trial courtâs ruling. See OâShaughnessy, 275 P.3d at 691 (âBatson does not require the rejection of a demeanor-based explanation for a peremptory challenge merely because the trial judge did not personally observe the relevant aspect of the prospective jurorâs demeanor.â). Furthermore, the court credited the detective who witnessed Juror G sleeping, noting that he was a âtrained observer.â

 Â¶57Â Â Â Â Â Â Â  The court also emphasized the prosecutorâs demeanor, by noting he gave the race-neutral explanation âpromptly,â implying that he was truthful and that the reason was not merely a pretext for discrimination. See People v. Robinson, 187 P.3d 1166, 1174Â (Colo. App. 2008) (âThe district court obviously (albeit implicitly) found the prosecutorâs stated [Batson] reasons credible, and we cannot say on this record that the court clearly erred in doing so.â).

 Â¶58Â Â Â Â Â Â Â  The prosecution articulated several race-neutral reasons for exercising a peremptory challenge to Juror G, and nothing in the record suggests that the trial court erred in crediting those reasons. Therefore, we conclude that the trial court did not clearly err when it denied Ellisâs Batson challenge as to Juror G.

 V. Mittimus

 Â¶59Â Â Â Â Â Â Â  Finally, Ellis contends that his mittimus incorrectly reflects a conviction for second degree murder in count five, instead of attempted second degree murder. We agree.

 Â¶60Â Â Â Â Â Â Â  The People concede that the mittimus is incorrect, yet argue that it does not need correction. They assert that it properly reflects that count five merges into count six, âMurder 1 â Extreme Indifference â Att,â which, they point out, would be impossible if the conviction were for second degree murder because there is no way to merge a completed second degree murder conviction with an attempted first degree extreme indifference murder conviction. They attribute the error to the computer software used to create the mittimus.

 Â¶61Â Â Â Â Â Â Â  On count five, the jury convicted Ellis of criminal attempt to commit murder in the second degree. Therefore, we agree that the mittimus is incorrect and must be amended. See Crim. P. 36 (clerical errors in the record may be corrected by the court at any time); People v. Childress, 2012 COA 116, Â¶52, __ P.3d __, __ (remanding to the trial court to correct mittimus). On remand, the trial court shall correct the mittimus to accurately reflect the juryâs verdict.

 VI. Conclusion

 Â¶62Â Â Â Â Â Â Â  The judgment is affirmed, the sentence is vacated, and the case is remanded for further proceedings and correction of the mittimus consistent with this opinion.

 JUDGE GABRIEL concurs.

 JUDGE BOORAS concurs in part and dissents in part.


 [1] The trial court sentenced Ellis on June 13, 2012. Miller v. Alabama, 567 U.S. ___, 132 S. Ct. 2455 (2012), was not decided until June 25, 2012. People v. Tate, 2015 CO 42, ___ P.3d ___, was not decided until June 1, 2015. We requested the parties to submit supplemental briefs to consider the applicability of Miller and Tate when a defendant, like Ellis, is convicted of offenses involving more than one victim.

 [2] We agree with the divisions in People v. Rainer, 2013 COA 51, Â¶68, ___ P.3d ___ (cert. granted Dec. 22, 2014), and People v. Lehmkuhl, 2013 COA 98, Â¶17, ___ P.3d ___, ___ (cert. granted Dec. 22, 2014), that Close v. People, 48 P.3d 528 (Colo. 2002), is no longer valid as to the category of juvenile offenders discussed there.
 Â 

 JUDGE BOORAS concurs in part and dissents in part.

 Â¶63Â Â Â Â Â Â Â  I respectfully dissent from the majorityâs view that the aggregate total of a defendantâs consecutive sentences can be considered a âde factoâ life without parole sentence for the purposes of Eighth Amendment protections, at least under current Colorado and United States Supreme Court case law. Therefore, I agree that Ellisâs judgment of conviction should be affirmed, but disagree that the case must be remanded.

 A. Cruel and Unusual Punishment

 Â¶64Â Â Â Â Â Â Â  The Eighth Amendment prohibits âcruel and unusual punishments,â U.S. Const. amend. VIII, and âguarantees individuals the right not to be subjected to excessive sanctions,â Roper v. Simmons, 543 U.S. 551, 560 (2005). Review under the Eighth Amendment encompasses two general categories: (1) challenges to the length of term-of-years sentences given all the circumstances in a particular case and (2) certain categorical restrictions on the sentence that may be imposed on a certain class of offender. See Graham v. Florida, 560 U.S. 48, 59 (2010). Most commonly the categorical restrictions have involved the deathÂ penalty. Id. at 60; see, e.g., Roper, 543 U.S. at 568 (Eighth Amendment bars capital punishment for juvenile offenders); Atkins v. Virginia, 536 U.S. 304, 320 (2002) (death penalty is cruel and unusual as to mentally retarded criminals). However, in Graham, the Supreme Court held that a sentence of life without the possibility of parole violated the Eighth Amendment when imposed on juvenile offenders for crimes other than homicide.

 Â¶65Â Â Â Â Â Â Â  Significantly, the Court did not address juvenile offenders who received consecutive, fixed-term sentences for committing multiple offenses. See Bunch v. Smith, 685 F.3d 546, 551 (6th Cir. 2012). Additionally, the Court specifically noted that it was not addressing juveniles who had committed homicide offenses. Graham, 560 U.S. at 63. Thus, the scope of Graham is unclear.

 Â¶66Â Â Â Â Â Â Â  As the United States Court of Appeals for the Sixth Circuit observed in Bunch, âcourts across the country are split over whether Graham bars a court from sentencing a juvenile nonhomicide offender to consecutive, fixed terms resulting in an aggregate sentence that exceeds the defendantâs life expectancy.â Bunch, 685 F.3d at 552. Here, Ellis received consecutive sentencesÂ for multiple offenses, including homicide.

 II. Aggregate Sentences

 Â¶67Â Â Â Â Â Â Â  Several divisions of this court have previously concluded or assumed that a lengthy aggregate sentence can amount to the functional equivalent or a âde factoâ sentence to life without parole, depending on the life expectancy of the defendant. See People v. Lehmkuhl, 2013 COA 98 (cert. granted Dec. 22, 2014); People v. Lucero, 2013 COA 53 (cert. granted Dec. 22, 2014); People v. Rainer, 2013 COA 51 (cert. granted Dec. 22, 2014). Here, unlike the defendants in Lehmkuhl, Lucero, and Rainer, Ellis was not only sentenced to a lengthy aggregate sentence, but also for committing a homicide. The Supreme Court, in Graham, specifically acknowledged the difference between juvenile offenders who committed both homicide and nonhomicide crimes. âJuvenile offenders who committed both homicide and nonhomicide crimes present a different situation for a sentencing judge than juvenile offenders who committed no homicide.â Graham, 560 U.S. at 63. Under an expansive reading of Graham, the Lehmkuhl, Lucero, and Rainer divisions of this court rejected our supreme courtâs analysisÂ in Close v. People, 48 P.3d 528, 538 (Colo. 2002), that for cruel and unusual punishment purposes, sentences should be assessed individually, rather than in their aggregate form.

 Â¶68Â Â Â Â Â Â Â  Under this âde factoâ life without parole analysis, it is unclear how the life expectancy of a defendant is to be determined, and what factors or variables can properly be considered. As a Florida appellate court observed in Henry v. State, 82 So. 3d 1084, 1089 (Fla. Dist. Ct. App. 2012), quashed by No. SC12-578, 2015 WL 1239696 (Fla. Mar. 19, 2015):

 If . . . under the notion that a term-of-years sentence can be a de facto life sentence that violates the limitations of the Eighth Amendment, Graham offers no direction whatsoever. At what number of years would the Eighth Amendment become implicated in the sentencing of a juvenile: twenty, thirty, forty, fifty, some lesser or greater number? Would gain time be taken into account? Could the number vary from offender to offender based on race, gender, socioeconomic class or other criteria? Does the number of crimes matter? . . . . Without any tools to work with, however, we can only apply Graham as it is written. If the Supreme Court has more in mind, it will have to say what that is.

 (Footnote omitted.)

 Â¶69Â Â Â Â Â Â Â  Additionally, as noted by Judge Dailey in his specialÂ concurrence in Lehmkuhl:

 What life expectancy tables should be used in forecasting the prospect of a juvenileâs becoming eligible for parole before he or she dies? As this case demonstrates, there is variation in the tables. And, given that variation, a sentence for a juvenile could be determined to be constitutional or unconstitutional depending on which table was used.

 What if the juvenile has a health issue dramatically reducing his or her life expectancy? Is the juvenileâs sentence to be reduced, so as to make him or her eligible for parole before his or her reduced life expectancy expires, regardless of the nature or number of crimes committed or the number of different jurisdictions in which crimes were committed?

 Lehmkuhl, Â¶31 (Dailey, J., specially concurring).

 Â¶70Â Â Â Â Â Â Â  In light of these difficulties, I would decline to engage in an expansive reading of Graham to conclude that our supreme courtâs opinion in Close has been effectively overruled. See People v. Tate, 2015 CO 42, Â¶27 (noting that the âcentralâ principle of the Eighth Amendmentâs ban on cruel and unusual punishment is proportionality).




These opinions are not final. They may be modified, changed or withdrawn in accordance with Rules 40 and 49 of the Colorado Appellate Rules. Changes to or modifications of these opinions resulting from any action taken by the Court of Appeals or the Supreme Court are not incorporated here. 



Colorado Court of Appeals Opinions || August 13, 2015


Back